# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 13, 2005

## STATE OF TENNESSEE v. BRENT LEMANE DUNCAN

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6860     Jon Kerry Blackwood, Judge**

---

**No. W2005-00068-CCA-R3-CD  - Filed December 21, 2005**

---

Following a jury trial, Defendant, Brent Lemane Duncan, was found guilty of aggravated assault, a Class C felony, and domestic assault, a Class A misdemeanor. Defendant received a sentence of three years for the felony and eleven months, twenty-nine days for the misdemeanor, to be served concurrently. The trial court ordered Defendant to serve sixty (60) days periodic confinement, to be served on weekends, and assessed fines against Defendant in the amount of $2,500.00 for each conviction. In his appeal, Defendant challenges the sufficiency of the evidence and argues that the trial court committed reversible error by (1) sustaining the State's objection to cross examination of the victim regarding her background; (2) sustaining the State's objection to the testimony of Defendant's mother regarding the reputation of the victim and the victim's propensity for truthfulness and veracity; and (3) sustaining the State's objection to Defendant's attempt to cross-examine the victim regarding prior inconsistent statements. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

Harriet S. Thompson, Bolivar, Tennessee, for the appellant, Brent Lemane Duncan.

Paul G. Summers, Attorney General and Reporter; Brian C. Johnson, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Joe Van Dyke, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

On August 30, 2003, the victim, Teresa Lenore McKinnie, was returning home from her 'play' father's home, which was near her own home. Ms. McKinnie received a ride to her home from her

friend Tommy Walker. On the way home, Ms. McKinnie noticed a silver Ford Mustang belonging to Defendant, driving behind Mr. Walker's car. Ms. McKinnie testified that the Mustang followed Mr. Walker's car to Ms. McKinnie's house. Mr. Walker did not see Defendant's car until he was driving away and saw the vehicle in his rearview mirror. Mr. Walker dropped Ms. McKinnie off at the bottom of the hill leading to her house. Ms. McKinnie testified that Defendant drove the silver Mustang up the hill past her house and then drove back down the hill into her yard.

Defendant is the biological father of Ms. McKinnie's son Alantay. Defendant told Ms. McKinnie that he stopped by her home because he had a gift for their child. Ms. McKinnie stated that she saw a bag from Goldsmith's department store in Defendant's car but she never actually saw a gift nor did Defendant identify the gift or give it to Ms. McKinnie. Ms. McKinnie stated that she and Defendant talked for a minute before she noticed that Defendant had very recently had something done to his hair. Defendant told Ms. McKinnie that he had his hair dyed and washed that day and asked Ms. McKinnie if she wanted to make some money braiding his hair. She agreed to braid Defendant's hair and at this point they entered her house to get the necessary supplies which were in the bathroom.

Ms. McKinnie testified that she went to the bathroom to retrieve the supplies and Defendant indicated that he wanted to use his own comb and went outside, presumably to get his own comb from the car. When Defendant returned, he sat down in a chair to allow Ms. McKinnie to braid his hair. As Ms. McKinnie began to part his hair, Defendant jumped up in the chair and Ms. McKinnie laughed and asked, "What's wrong with you?" Ms. McKinnie testified that Defendant answered, "Today is the day you're going to die. If I can't have you, ain't nobody else going to have you." Ms. McKinnie asked, "What is going on? If you want to get your hair did, come on and get your hair did [sic] 'cause I got something to do . . . ." Defendant threatened Ms. McKinnie again, repeating, "[T]oday you're going to die . . . If I can't have you."

Ms. McKinnie retreated from Defendant, backing herself into a corner by the kitchen sink. Defendant then pulled a wooden souvenir bat from his clothes. Ms. McKinnie kept repeating "Come on and get your hair did if your [sic] going to get it did," to which Defendant responded, "So you think I'm playing with you." Ms. McKinnie told Defendant, "Yeah, I'm taking it as your [sic] playing with me." Defendant then hit Ms. McKinnie three times with the bat, twice in the front of her head and once in the back. Defendant asked Ms. McKinnie again, "You think I'm playing?" Ms. McKinnie testified that she responded "Yeah" but she was no longer thinking clearly at this point. Ms. McKinnie explained that she thought Defendant was just playing with her, trying to convince her to be with him.

Defendant next pulled out a gun, which Ms. McKinnie identified at trial as the gun she had purchased for Defendant when they were dating. Ms. McKinnie testified that Defendant pointed the gun at her chest and said, "Bitch, you're going to die." Ms. McKinnie laughed and told Defendant, "I'm not going nowhere [sic]." Defendant then dropped the bat, pulled back the slide on the gun and pulled the trigger. The gun did not discharge. Ms. McKinnie told Defendant to leave. He then shoved the gun in Ms. McKinnie's mouth, causing her lip to bleed and chipping one of her teeth. Ms.

McKinnie testified that at this point she no longer thought Defendant was playing, but thought "this was it," and she was about to die.

Ms. McKinnie began to cry and plead for her life and the welfare of her children. Defendant again told Ms. McKinnie that she would be with him or die. Defendant then pulled the slide back and squeezed the trigger another time. Again, the gun did not discharge. Defendant pulled the gun from Ms. McKinnie's mouth and put the gun to her head. Ms. McKinnie begged Defendant, "I got two kids to live for. Don't do this to me. Please, please, please, don't do this to me . . . ." Defendant pulled the slide and the trigger yet another time. Once again, the gun did not discharge. When Defendant moved to pull the slide a fourth time, Ms. McKinnie jumped up to defend herself and reached for her eyebrow archers which were lying on the counter. Defendant and Ms. McKinnie began to fight and scuffle back and forth. Ms. McKinnie stated that she fell and while she was down Defendant left the house going toward his car. Ms. McKinnie, still carrying the eyebrow archers, followed Defendant to his car. As Defendant skidded out of Ms. McKinnie's yard, leaving behind tire marks, she scraped Defendant's car with her eyebrow archers.

After Defendant left, Ms. McKinnie attempted to call the police but was unable to get a cell phone signal. Ms. McKinnie stated that her bathroom window faced the street below her house and from the window she was able to yell for assistance and have her friend Robin Anderson call the police. The Whiteville Police Department received the call at 4:35 p.m. on August 30, 2005. Patrolman Kevin Scott was dispatched to Ms. McKinnie's home. Officer Scott testified that upon arriving at the scene, he observed furniture and clothes strewn about the house. He stated that, "Ms. McKinnie was distraught, she was frantic, she was crying." Officer Scott further testified that Ms. McKinnie had two knots that were starting to come up on her forehead, another knot coming up on the back of her neck, a bloody lip on the left-hand side of her mouth, and she was beginning to show light bruising on her lower back. Ms. McKinnie told Officer Scott that Defendant inflicted the injuries and she described a souvenir baseball bat and a black, semi-automatic pistol as the weapons used to cause her injuries. Officer Scott testified that Ms. McKinnie's injuries were consistent with injuries caused by such weapons, although he admitted on cross-examination that he did not have the medical training to pinpoint exactly when the injuries may have occurred. Ms. McKinnie declined to be taken to the hospital for medical treatment, preferring to be taken to her mother who was at Whiteville Lake on a fishing trip. Officer Scott transported Ms. McKinnie to Whiteville Lake after interviewing her regarding the incident.

After interviewing Ms. McKinnie and taking statements from other witnesses, Officer Scott identified Defendant as the suspect who caused Ms. McKinnie's injuries. Officer Scott testified that witnesses saw Defendant leaving the scene of the assault, saw him at the scene prior to Ms. McKinnie being dropped at her residence, and saw him in the area at approximately 4:40 p.m. Robin Anderson also testified that he saw Defendant in the area shortly after he called the police. Officer Scott testified that witnesses saw Defendant driving a silver Ford Mustang. He stated that he observed skid marks in Ms. McKinnie's front yard but admitted on cross-examination that he did not personally see Defendant at the scene nor did he see Defendant driving a silver Ford Mustang on August 30, 2003. On September 23, 2003, approximately three weeks after Defendant was charged with assaulting Ms.

McKinnie, Officer Scott stopped Defendant for a routine traffic violation. Officer Scott obtained Defendant's permission to search his car, a silver Ford Mustang. During the consent search, Officer Scott recovered a semi-automatic pistol under the driver's seat of Defendant's car. The pistol, a Keltech .40 caliber pistol, was identified by Ms. McKinnie at trial as the pistol used by Defendant to assault her. The souvenir bat was never recovered or identified by Officer Scott.

Officer Scott found the scene at Ms. McKinnie's home to be consistent with her version of the events that took place on August 30, 2003. Defendant denied being at the scene and offered an alibi and witnesses to corroborate his version of what happened. Defendant's alibi witnesses, Eric Hill and Shanta Newble, testified that on August 30, 2003, Defendant was at the Upscale Salon where the witnesses were employed. Mr. Hill testified that he shaved Defendant and lined his hair at approximately 2:30 p.m. He further testified that when he left the salon around 3:30 p.m. Defendant was still there watching television and waiting for Shanta Newble to do his hair. Ms. Newble testified that she relaxed, colored, and conditioned Defendant's hair beginning somewhere between 12:00 p.m. and 1:30 p.m. and finishing at approximately 2:30 p.m. She stated that she did not have her sight on Defendant at all times and she conceded that there were extended periods of time that she did not know where he was, but that she was pretty certain that he left the shop after 5:00 p.m

## II. Sufficiency of the Evidence

In challenging the sufficiency of the evidence, Defendant argues that the State failed to prove all elements of the charged offenses, domestic assault and aggravated assault, beyond a reasonable doubt and to a moral certainty. Specifically, Defendant argues that Ms. McKinnie's testimony did not establish the requisite fear of imminent bodily harm, and the State did not prove beyond a reasonable doubt that Defendant displayed a pistol at the time of the offense. With respect to the domestic assault conviction, Defendant argues that the State failed to prove beyond a reasonable doubt that Defendant was at the victim's house on the date of the incident or that Defendant caused the victim serious bodily harm.

When an accused challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560, 573 (1979). This court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The accused then has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *State v.Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

In determining the sufficiency of the evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *Grace,* 493 S.W.2d at 476.

Defendant was convicted of aggravated assault and domestic assault. An accused commits aggravated assault when he or she intentionally or knowingly commits assault as defined in Tennessee Code Annotated section 39-13-101 *and* the accused (a) causes serious bodily injury to another; or (b) uses or displays a deadly weapon. T.C.A. § 39-13-102(a)(1)(2) (2005) (emphasis added). A person commits assault who (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative. T.C.A. § 39-13-101(a)(1)(2)(3) (2002). A person is guilty of the separate and distinct crime of domestic assault when that person assaults another as defined in Tennessee Code Annotated section 39-13-101, and that assault is committed against a person who is the perpetrator's family or household member. T.C.A. § 39-13-111(b) (2002). The statute defines "family or household member" as a "spouse, former spouse, person related by blood or marriage, or person who currently resides or in the past has resided with that person as if a family, or a person who has a child or children in common with that person regardless of whether they have been married or resided together at any time." T.C.A. § 39-13-111(a).

Defendant first argues that the evidence is insufficient to support his conviction for aggravated assault because the State did not prove that Defendant intentionally and knowingly caused Ms. McKinnie to reasonably fear imminent bodily injury. In support of his argument, Defendant offers Ms. McKinnie's admissions at trial that she started to laugh when Defendant told her, "Today is the day you're going to die. If I can't have you, ain't nobody else going to have you." Defendant further argues that even when he allegedly displayed the souvenir bat, Ms. McKinnie's response was, "You must don't [sic] want your hair did [sic]," and that even after he allegedly hit Ms. McKinnie with the bat and asked her, "You think I'm playing?" her response was, "Yeah." Defendant notes that Ms. McKinnie did not run away, yell for help, or use her phone during the incident as further proof that she did not fear bodily harm.

Defendant also argues that the State did not prove beyond a reasonable doubt that Defendant used or displayed a deadly weapon in commission of the assault. Defendant submits that Ms. McKinnie's testimony is the only conclusive proof that a pistol was used during the assault and that her testimony alone is insufficient evidence to sustain the conviction of aggravated assault. Defendant

points to the fact that the pistol introduced into evidence at trial was not recovered contemporaneously with his arrest, but it was recovered approximately three weeks later during a consent search of Defendant's car. Defendant argues that there is no causal connection between the handgun recovered by Officer Scott during the September 23, 2003, search and the offense committed on August 30, 2003. Defendant also highlights the lack of spent handgun shells at Ms. McKinnie's house, arguing that had the trigger been pulled on a fully loaded gun spent shells would have been present.

Viewing the evidence in a light most favorable to the State, we conclude that the evidence is sufficient for a rational trier of fact to find Defendant guilty of aggravated assault beyond a reasonable doubt. It is well-established law in Tennessee that the testimony of a victim, standing alone, is sufficient to support a conviction. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). As previously stated, questions regarding the credibility of witnesses and the weight and value of the evidence presented at trial are issues that are resolved by the trier of fact and this Court will not re-weigh or re-evaluate this evidence. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Ms. McKinnie's testimony established that Defendant told her she was going to die, that he aimed a pistol at her chest and squeezed the trigger, and that when the pistol failed to discharge Defendant shoved the pistol into Ms. McKinnie's mouth causing her to fear for her life. It is of no consequence that the gun used in the assault was not recovered from Defendant until three weeks after the incident. It is sufficient that Ms. McKinnie identified the weapon at trial as the one Defendant used in the assault. Nor is it of consequence that there were no spent handgun shells at Ms. McKinnie's house. If the gun did not discharge, as Ms. McKinnie claimed, it would obviously be unlikely such evidence would be recovered from the crime scene. The jury was free to reject Ms. McKinnie's testimony, but as evidenced by its verdict, the jury accredited her testimony as to the events of the crime. Accordingly, we find that the evidence presented at trial met the requisite elements to uphold a conviction for aggravated assault. Defendant is not entitled to relief on this issue.

Defendant next argues that there is insufficient evidence to support his conviction for domestic assault because the State did not prove beyond a reasonable doubt that Defendant caused Ms. McKinnie bodily injury. In support of his argument, Defendant asserts that although Officer Scott observed Ms. McKinnie's injuries, he did not actually see Defendant inflict those injuries, he merely identified Defendant as the perpetrator based on statements taken from Ms. McKinnie. Defendant submits that he did not inflict Ms. McKinnie's injuries and that Ms. McKinnie failed to seek medical treatment because such treatment would reveal that someone other than himself inflicted the injuries, or that the injuries were actually self-inflicted. Defendant argues that his alibi witnesses created reasonable doubt that he was present at Ms. McKinnie's home on August 30, 2003, and the State did not present contrary evidence sufficient to prove beyond a reasonable doubt that Defendant was at the scene and caused the injuries.

As stated above, domestic assault, is the commission of "an assault as defined in [Tennessee Code Annotated section] 39-13-101 against a person who is that person's family or household

member." T.C.A. § 39-13-111(b). In other words, once simple assault is proven, a conviction for domestic assault requires an additional and separate element that the victim be the perpetrator's "family or household member." T.C.A. § 39-13-111(b). As relevant to this case, "[a] person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another." T.C.A. § 39-13-101(a)(1). Where a Defendant has a child or children in common with his victim, the victim qualifies as a "family or household member" as defined by Tennessee Code Annotated section 39-13-111(a). There is no dispute that Defendant and the victim, Ms. McKinnie, are the biological parents of Ms. McKinnie's son. Nor does Defendant challenge the State's assertion that his relationship to the victim establishes the offense as a domestic assault if simple assault is proven beyond a reasonable doubt. Therefore, we turn to Defendant's argument that the State failed to prove he caused Ms. McKinnie bodily harm.

Officer Scott testified that he observed injuries to Ms. McKinnie's person. Specifically, he testified that Ms. McKinnie had sustained a bloodied lip, two knots on her head, a knot on the back of her neck, and light bruising on her lower back. Officer Scott testified that Ms. McKinnie told him her injuries were inflicted by Defendant. In pertinent part, Tennessee Code Annotated section 39-11-106(a)(2) (1997) defines "bodily injury" as a "cut, abrasion, bruise, burn or disfigurement." As stated above, it is the province of the jury to determine the credibility of witnesses and resolve inconsistencies in testimony and this Court will not overturn such determinations. *State v. Carruthers*, 35 S.W.3d 516, 557-558 (Tenn. 2000). The jury resolved all apparent inconsistencies in favor of the State, finding that Defendant was in fact at Ms. McKinnie's residence and that he caused her bodily injury on August 30, 2003. After considering the evidence in a light most favorable to the State, we find that the evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Defendant is guilty of domestic assault.

## III. Evidentiary Rulings

Defendant next contends that the trial court committed reversible error in sustaining the State's objections to certain witnesses' testimony. Defendant first asserts that the trial court erred in sustaining the State's objection to the cross-examination of Ms. McKinnie concerning her background. The testimony in pertinent part is as follows:

Q:                    Do you have a beauty license, a cosmetology license?

A:                    No, because I don't do nothing but braid hair.

Q:                    Do you have a job where you work?

A:                    No, ma'am.

Q:                    How do you live?

[PROSECUTOR]:    Objection.

| THE COURT: | Be sustained. |
| --- | --- |
| Q: | Do you receive child support-- |
| [PROSECUTOR]: | Objection. |
| A: | No. |
| THE COURT: | Sustained. |

Defendant argues that in excluding this evidence, the jury was denied an opportunity to evaluate Ms. McKinnie's background, which Defendant argues reflects upon her veracity and credibility as a witness. Defendant submits that in sustaining the State's objection and denying inquiry into Ms. McKinnie's employment status and source of income, the trial court effectively denied him the right to effective cross examination.

Defendant next contends that the trial court erred in sustaining the State's objection to the testimony of Catherine Duncan, Defendant's mother, regarding Ms. McKinnie's reputation for truthfulness and veracity. The pertinent testimony is as follows:

| Q: | Now, do you know Ms. McKinnie, Trese McKinnie, Lenore McKinnie, Len McKinnie? |
| --- | --- |
| A: | I know her as Len McKinnie. |
| Q: | Today, people have been calling her Trese, but you know her as Len. |
| A: | As Len. |
| Q: | And how is it that you know her? |
| A: | My son got involved with her when he was like 14 or 15 years old. |
| Q: | And has she been in and out of your family's life since then? |
| A: | Absolutely. |
| Q: | And can you tell the Court in what respect you've had contact with her? |
| [PROSECUTOR]: | I object to this line of questioning. |

| | |
|---|---|
| THE COURT: | Be sustained. |
| Q: | Do you know when your son stopped having a relationship with Ms. McKinnie? |
| A: | Well, they'd break up, you know, off and on–off and on–off and on–and he met his wife, and I'm sure he hasn't had any contact with her since. |
| [PROSECUTOR]: | Objection |
| THE COURT: | Be sustained. |

Defendant asserts that the sustained objections unduly limited his inquiry regarding the reputation and credibility of the victim. Defendant contends that pursuant to Tennessee Rule of Evidence 404(a)(2), "a pertinent character trait of the victim of crime offered by an accused . . ." is admissible, and failure to admit this evidence regarding Ms. McKinnie's reputation for truthfulness unfairly prejudiced Defendant.

Finally, Defendant contends that the trial court erred in sustaining the State's objection to his attempt to impeach Ms. McKinnie regarding prior inconsistent statements. The pertinent testimony is as follows:

| | |
|---|---|
| Q: | Okay, do you remember testifying before in General Sessions Court about this case? |
| A: | Yes, ma'am, I do. |
| Q: | Okay. And did you swear to tell the truth at that time like you have today? |
| A: | Yes, ma'am, I did. |
| Q: | And so your testimony should be identical to what you testified to before; correct? |
| A: | Yes, Ma'am. |
| Q: | Okay. And anything that you told the police officer that he included in his report or in the affidavit that he made out should be correct? |
| A: | That's right, ma'am. |

. . . .

Q:          Now, do you remember when you testified before, you said
            that he went to get rubber bands at that time? Do you
            remember saying that?

A:          No.

Q:          Oh, okay. So my notes would be wrong when I wrote that.

[PROSECUTOR]:   Judge, I think Ms. Thompson is testifying at this point and
                those aren't into evidence.

THE COURT:      That will be–That's right.

Q:          You don't remember saying that?

A:          No.

Q:          Your story has changed.

[PROSECUTOR]:   Objection.

THE COURT:      That is sustained.

Defendant contends that he was prejudiced when he was denied inquiry to impeach the witness by introducing proof of the substance of the prior inconsistent statement. Defendant further contends that failure to give jury instructions regarding prior inconsistent statements amounts to reversible error.

We are unable to address the evidentiary issues because in all instances Defendant failed to make any offers of proof regarding the evidence he wished to introduce. Pursuant to Tennessee Rule of Evidence 103, error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. In case the ruling on the record is "one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission [must be] made known to the [trial] court by offer or [must be] apparent from the context." Tenn. R. Evid. 103(a)(2) (2001). Failure to make an offer of proof results in waiver of the issue. *State v. Sims*, 45 S.W.3d 1, 15 (Tenn. 2001); *State v. Hall*, 958 S.W.2d 679, 713-714 (Tenn. 1997). The defense made no proffers of evidence to the trial court regarding what additional testimony might show. Accordingly, Defendant is not entitled to relief on these issues.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE